IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| THE MEDICAL PROTECTIVE COMPANY OF FORT WAYNE, INDIANA, <br><br> Plaintiff, <br><br> -vs- <br><br> AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, <br><br> Defendant. | Case No. **1:13CV 357 JTM** <br><br> **_JURY TRIAL DEMANDED_** |

**COMPLAINT FOR DAMAGES**

Plaintiff The Medical Protective Company of Fort Wayne, Indiana ("MedPro"), as its Complaint for Damages against Defendant American International Specialty Lines Insurance Company ("AISLIC"), states as follows:

## I.
## NATURE OF THE ACTION

1. This is an action for breach of an insurance policy issued by AISLIC to MedPro covering MedPro's potential extracontractual liabilities such as "bad faith" (basically insurance from AISLIC to MedPro for claims handling errors and omissions and resulting liabilities). Yet when some third-party claimants in Texas (the Bramletts) brought a significant and novel bad faith claim against MedPro—precisely what AISLIC had agreed to insure and charged a $190,000 annual premium for—AISLIC refused to cover MedPro for the Bramletts' claim. This was a blatant breach of the policy.

2. AISLIC now is asserting that MedPro had absolutely no protection for any bad faith claims related to underlying matters in litigation at the time of the inception of the policy. In other words, AISLIC contends that a policy issued for claims handling related liabilities, did not

apply to claims arising from cases that MedPro was doing the claims handling on at the time it purchased the policy. It would be the functional equivalent of a homeowner's policy insurer saying, after the fact, "we didn't mean your current home." This position, of course, makes no sense given the type of insurance coverage at issue here and the policy language. Having agreed to be the claims handling errors and omissions insurer for MedPro, AISLIC must honor its promise to MedPro and pay damages for having breached its promise.

## II.
## PARTIES

3. Founded by two Fort Wayne doctors in 1899, MedPro was the nation's first provider of healthcare malpractice insurance. Today, with more than 120,000 insureds in the healthcare industry, MedPro is the nation's leading provider of medical and dental malpractice insurance.

4. MedPro is an Indiana corporation with its principal place of business in Fort Wayne, Indiana. MedPro legally transacts insurance business in the State of Indiana and within the geographical jurisdiction of this Court.

5. AISLIC issued a "claims made" professional liability policy to MedPro for the policy period from July 1, 2006 to July 1, 2007 covering MedPro for its potential extracontractual liabilities on terms discussed further below. The AISLIC Policy was issued to MedPro at its headquarters in Fort Wayne, Indiana.

6. AISLIC is an Illinois corporation with its principal place of business located in New York. It is part of the AIG family of insurance companies.

## III.
## JURISDICTION AND VENUE

7. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

9. This matter is ripe for adjudication because there exists an actual controversy between the parties (namely, AISLIC's breach of contract).

## IV.
## FACTUAL BACKGROUND

A. **The AISLIC Professional Liability Coverage**

10. Insurance companies like MedPro often purchase professional liability or "E&O" insurance to protect against potential extracontractual claims—including bad faith claims—from its insureds and third parties. This is an important and necessary protection for an insurance company like MedPro given the potential difficulty and expense of litigating bad faith claims, the myriad state laws for claim handling and the duty to settle (among other things) that potentially can come into play, its number of claim handlers and the potential for exposure to damages well in excess of applicable policy limits—not to mention the risk of potential exposure to punitive or exemplary damages in some jurisdictions.

11. AISLIC starting insuring MedPro for professional liability on July 1, 2005, which is called the "inception date." The premium for the first policy was $192,890.

12. The original policy was renewed on July 1, 2006 for another annual period at a premium of $190,980. This renewal policy is the relevant policy in this dispute. A copy of the relevant policy, Insurance Company's Professional Liability Insurance Policy No. 672-86-50,

issued for the claims-made period from July 1, 2006 – July 1, 2007 (the "Policy"), is attached as Exhibit 1.

13. The Policy has a $5 million limit of liability, including defense costs, with a $1 million retention (similar to a deductible in lay person's terms).

14. Under the Policy, AISLIC agrees to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims made against the Insured and reported in writing to the Company during the Policy Period for any Wrongful Act of the Insured . . . in the rendering of or failure to render Professional Service."

15. The Policy also requires AISLIC to "pay on behalf of the Insured Defense Costs, Charges and Expenses." AISLIC has the right but not the duty to defend.

16. Pursuant to the "Amend Special Reporting Clause Endorsement" to the Policy, if during the Policy Period "the General Counsel, CEO or CFO [of MedPro] shall become aware of any occurrence which may reasonably be expected to give rise to a claim against the Insured for a Wrongful Act which occurred during or prior to the Policy Period, and provided the Insured gives written notice to the Company during the Policy Period," then any claim subsequently made against the Insured arising out of the Wrongful Act shall be deemed a claim made during the policy period.

17. The term "claim" used throughout the Policy is not a defined term.

18. "Wrongful Act" is defined as "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted."

19. "Professional Services" means "services rendered or required to be rendered solely in the conduct of the Insured's claims handling and adjusting, risk management, safety

engineering, safety inspections and loss control operations, personal injury rehabilitation operations, insurance consulting, or actuarial consulting services."

20. In the insurance industry, professional liability insurers often require an insured to answer a "warranty" question as part of the application, particularly for new business (as was the case with MedPro on July 1, 2005). A warranty question might ask, for example, "Does any prospective insured person or entity have knowledge or information of any circumstances of any allegation or contentions of any incident which may result in any claim being made against the applicant or any of its past or present directors, officers, employees, or any predecessors in business?" Any circumstances that existing at the time of the application, whether or not disclosed, would not be covered.

21. AISLIC, however, did not require MedPro to answer a warranty question either in the original application or renewal application. Indeed, the application for the Policy at issue here included the very question quoted in the paragraph above—***only it and several other questions were crossed off the application.***

22. AISLIC's decision to omit any warranty questions from its application was fully consistent with MedPro's expectation of receiving broad prior acts protection at the time the AISLIC coverage incepted—the policy and the coverage it provided would make no sense to purchase otherwise, and AISLIC would have known it at the time. Nowhere in the application or the Policy did AISLIC advise MedPro that bad faith claims arising from underlying claims in litigation pending as of July 1, 2005 (when the first AISLIC policy incepted) would not be covered. This would be a significant and unacceptable limitation of coverage for an insurance company like MedPro, which advised AISLIC in the application that it was handling thousands of underlying claims against its insureds, most of which (85%) were in litigation. If AISLIC had

such an intent at the time (which MedPro still would like to believe is not the case), AISLIC's actions in securing the insurance contract with MedPro would have been fraudulent.

B. **The Bramletts' Extracontractual Claim Against MedPro**

23. On June 26, 2007, MedPro submitted a "supplemental disclosure" to AISLIC, providing information about a "potential claim" arising from an underlying medical malpractice claim against a MedPro insured captioned *Bramlett v. Phillips* pending in Lubbock County, Texas (the "Bramlett Malpractice Claim").

24. As MedPro advised AISLIC at the time, "Plaintiffs made two policy limit demands upon [MedPro] during the discovery of the case, but [MedPro] did not accept. When policy limits were offered, they were rejected, with the plaintiffs suggesting that Med Pro had been 'Stowerized' [i.e., set up for a bad faith claim] under Texas law."

25. AISLIC promptly acknowledged notice of the potential claim under the Policy.

26. The Bramlett Malpractice Claim had been pending since May 2003, when it was filed against MedPro's insured, Benny Phillips, M.D., and a hospital, which was not MedPro's insured.

27. The plaintiffs in the Bramlett Malpractice Claim were the estate and decedents of Dr. Phillips' patient Vicky Bramlett. Mrs. Bramlett had died in the hospital after a fairly routine surgery, which Dr. Philips had performed.

28. The Bramletts settled with the hospital for $2.3 million in late 2003.

29. On December 17, 2003, the Bramletts demanded $200,000 from MedPro to settle the Bramlett Malpractice Claim with an original acceptance deadline of January 16, 2004.

30. $200,000 was Dr. Phillips' policy limit. The Bramletts characterized this demand as a "*Stowers* demand" under Texas law, meaning that the plaintiffs were offering to release Dr.

Phillips fully and unconditionally from the Bramlett Malpractice Claim, but only if MedPro paid the demand before the expiration of the stated deadline.[1]

31. At the time of the first demand, the Bramletts had not yet submitted an expert opinion that Dr. Phillips violated the applicable standard of care (a statutory requirement under Texas law for the case to proceed against Dr. Phillips), and no depositions had been taken. After consulting with Dr. Phillips' defense counsel—who had been selected by Dr. Phillips, not MedPro—MedPro authorized defense counsel to respond to the settlement demand by asking the Bramletts' counsel for discovery responses, and expert report and deposition dates for key witnesses.

32. The Bramletts eventually obtained an expert opinion that Dr. Phillips violated the standard of care and issued another settlement demand for $200,000 to MedPro with an extremely short deadline (17 days).

33. MedPro consulted again with Dr. Phillips' chosen defense counsel, who agreed with MedPro that settlement discussions should await completion of the discovery that had been requested in response to the first settlement demand. Accordingly, defense counsel responded to the Bramletts' second demand in April 2004 by reiterating that settlement discussions were premature and again requesting deposition dates for key witnesses from the Bramletts' counsel.

34. At no time did Dr. Phillips' or his chosen defense counsel demand that MedPro accept either the first or second settlement demand. Indeed, according to Dr. Phillips' counsel, the case was defensible from Dr. Phillips' perspective, and Dr. Phillips was willing to continue defending the case.

---

[1] *See Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994) (identifying elements of a *Stowers* claim).

35. The parties to the Bramlett Malpractice Claim conducted discovery in earnest over the next several months, and a mediation was scheduled for February 2005.

36. Before the mediation, MedPro offered to settle with the Bramletts for the $200,000 policy limit. The Bramletts rejected this offer.

37. During the mediation, MedPro offered the policy limit again, and it was rejected.

38. At this time, the Bramletts were demanding more than the policy limits to settle. According to the Bramletts, MedPro had been "*Stowerized*" because it failed to accept either of the two *Stowers* demands issued in 2004.

39. Moreover, Dr. Phillips had obtained new counsel to represent him in connection with the mediation. This new counsel demanded that MedPro offer immediately to pay the policy limits (which MedPro did before the mediation), and also demanded that MedPro should agree to "settle the case fo[r] amounts in excess of the policy limits" if necessary.

40. MedPro denied that it had *Stowers* liability given that the two *Stowers* demands were issued early in the case before important discovery had been conducted (such as Dr. Phillips' deposition and expert depositions) and included unreasonably short deadlines. Moreover, Dr. Phillips and his counsel had agreed fully with MedPro to defer settlement discussions until this discovery had been taken. Accordingly, MedPro was secure in its belief that its liability was limited to the $200,000 limit and the company had not been "*Stowerized.*"

41. MedPro also understood that Dr. Phillips' liability was capped under Texas law: the physician liability cap set forth in now-repealed Texas Code Article 4590i § 11.02(a). Thus, MedPro had **two** layers of protection from extracontractual liability, the policy limit itself and the physician liability cap.

42. The case went to trial in late 2005 (after the AISLIC coverage incepted). The Bramlett Malpractice Claim then took several unexpected and extremely problematic twists from MedPro's perspective.

43. On October 18, 2005, a trial court in Lubbock County, Texas, entered a verdict and judgment exceeding **$12 million** against Dr. Phillips. The trial court went on to find that the then-operative physician liability cap, repealed Article 4590i § 11.02(a), did not apply to the judgment "because facts exist to enable a party to invoke the common law theory of recovery commonly known as the '*Stowers* Doctrine.'" Citing this so-called *Stowers* "exception" to the cap contained in (former) Article 4590i §11.02(c), the trial court purported to find MedPro liable under *Stowers* for not having accepted either of the two policy-limits demands from the Bramletts within the time limits set forth in those demands and entered a judgment against Dr. Phillips for the full verdict with certain adjustments (such as a set-off for the hospital settlement).

44. This was an extraordinary and unprecedented holding that was not briefed to the trial court, and, of course, MedPro was not a party to either the underlying suit or judgment in the Bramlett Malpractice Claim.

45. Nonetheless, on March 19, 2007, the Texas Court of Appeals *affirmed* the trial court's judgment disregarding the physician liability cap because of the so-called *Stowers* "exception."

46. On Dr. Phillips' petition to the Texas Supreme Court, the court in 2009 reversed the trial judge's failure to apply the cap to the judgment against Dr. Phillips and its purported factual findings as to MedPro—but upheld the unprecedented notion that MedPro could be liable for an excess judgment over and above the physician's liability to the Bramletts under the

physician liability cap.[2] In a 5-4 decision, the Texas Supreme Court held that "both the statutory cap and its exception can be applied as written by ***conforming the judgment against the physician*** to section 11.02(a)'s cap and ***reserving for another case*** any suit against the insurer under section 11.02(c)'s *Stowers* exception."[3]

47. MedPro intervened in the Texas Supreme Court on its own behalf to obtain reconsideration, but this, too, was denied.

48. Ironically, after the Bramletts filed their claim against Dr. Phillips but before the Texas Supreme Court's decision in *Bramlett* I, the Texas legislature had amended the operative statute to preclude the absurd interpretation reached in *Bramlett* I—absurd because the purpose of the cap was to reduce malpractice insurance premiums for doctors, so it would be counterproductive to hold insurers liable for the full amount of a malpractice judgment beyond the liability cap. As amended, the current Texas statute clarifies that the liability cap applies to insurers as well as insured defendants. Unfortunately for MedPro, the Texas Supreme Court interpreted the amendment as a change in the law to be applied to insurers prospectively, as opposed to a clarification of existing law. Thus, to the best of MedPro's knowledge, no insurer before MedPro, and none after, has had to face an extracontractual claim invoking the principles announced in *Bramlett I*. It is truly *sui generis*.

49. Within days of the Texas Supreme Court's 2009 ruling in *Bramlett I*, the Bramletts ***sued MedPro for the first time***—invoking the court's freshly minted *"Bramlett"* claim, that is, a direct liability action by the underlying third-party claimants against MedPro based on its alleged unreasonable refusal to settle the underlying suit against Dr. Phillips, and

---

[2] *See Bramlett v. Phillips*, 288 S.W.3d 876, 882 (Tex. 2009) ("*Bramlett I*").

[3] *Id.* (emphasis added).

seeking as consequential damages the difference between the uncapped jury verdict and the capped court judgment against Dr. Phillips.

50. MedPro, for its part, paid the Bramletts the capped portion of the judgment (approximately $1.7 million) in an attempt to mitigate the far greater damages being claimed by the Bramletts—an amount *exceeding $10 million* based on the full amount of the original jury verdict.

51. After several years of procedural maneuvers by the Bramletts attempting to secure a state court venue for their claims against MedPro, the operative complaint was removed successfully to the United States District Court for the Northern District of Texas (Dallas) with case number 3:10-cv-2048-D before Honorable Judge Sidney A. Fitzwater (the "Bramlett Extracontractual Claim"). A true and correct copy of the operative complaint setting forth the Bramlett Extracontractual Claim is attached as Exhibit 2.

52. Judge Fitzwater denied MedPro's motion to dismiss the Bramlett Extracontractual Claim and later denied MedPro's motion for summary judgment. According to Judge Fitzwater, the Texas Supreme Court in *Bramlett I* had expressly granted the Bramletts the right to bring such a claim under the repealed physician liability cap. The Bramlett Extracontractual Claim was set for trial beginning in October 2013.

53. MedPro and the Bramletts conducted a mediation shortly before trial and reached a confidential settlement. The amount of the settlement was less than half of the damages being claimed by the Bramletts in the Bramlett Extracontractual Claim, but was high enough that it would exhaust the full $5 million limit of the AISLIC Policy in excess of the $1 million retention.

C.  **AISLIC's Denial Of Coverage To MedPro**

54.  On March 29, 2010, AISLIC issued a supplemental coverage letter to MedPro reserving rights in connection with the Bramlett Extracontractual Claim. This letter asserted several new policy defenses on AISLIC's part but did not purport to deny coverage.

55.  Before the Bramlett Extracontractual Claim was mediated, MedPro demanded that AISLIC take control of the settlement discussions and negotiate a settlement on behalf of its insured, MedPro. AISLIC refused, thereby forcing MedPro to fund the settlement.

56.  Prior to MedPro funding the settlement, AISLIC agreed that it would not raise lack of consent as an additional coverage defense. In other words, even though AISLIC had not agreed to cover the claim, AISLIC was not disputing that MedPro had a right to settle or that a settlement would be in all parties' best interests.

57.  Since funding the settlement, MedPro has demanded that AISLIC reimburse MedPro for its settlement payment up to AISLIC's $5 million policy limit. AISLIC refused this demand as well.

## V.
## AISLIC HAS BREACHED THE POLICY BY REFUSING TO PAY FOR SETTLEMENT OF THE *BRAMLETT* EXTRACONTRACTUAL CLAIM

58.  MedPro incorporates all previous allegations as if fully set forth herein.

59.  MedPro and AISLIC entered into a contract of insurance (the Policy), which is attached as Exhibit 1.

60.  The Bramlett Extracontractual Claim is deemed to be a claim made against MedPro and reported in writing to AISLIC during the July 1, 2006-July 1, 2007 policy period under the "Amend Special Reporting Clause Endorsement" of the Policy.

61.  The Bramlett Extracontractual Claim alleged a Wrongful Act by MedPro in the rendering of or failure to render Professional Service.

62. MedPro has fulfilled all conditions in the AISLIC Policy that are relevant to coverage of the Bramlett Extracontractual Claim.

63. Under the Policy, AISLIC is obligated to pay on behalf of MedPro all sums which MedPro becomes legally obligated to pay as damages in connection with the Bramlett Extracontractual Claim in excess of the $1 million retention and within the $5 million limit of liability.

64. AISLIC has refused to pay the amounts it owes under the Policy for the Bramlett Extracontractual Claim.

65. AISLIC's breach of the Policy has caused damage to MedPro.

66. AISLIC thus has breached the Policy and owes MedPro all consequential damages of the breach in an amount to be determined at trial.

## VI.
## DEMAND FOR JURY TRIAL

67. MedPro demands a jury trial on all issues so triable.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, the Medical Protective Company of Fort Wayne, Indiana respectfully requests that this Court:

(A) Enter judgment declaring that AISLIC has a duty under the Policy to pay for the settlement of the *Bramlett* Extracontractual Claim;

(B) Award MedPro its full consequential damages for AISLIC's breach of contract.

(C) Award MedPro prejudgment interest;

(D) Award MedPro its attorney fees and costs incurred herein; and

(E) Award MedPro any other relief to which it may be entitled.

Respectfully submitted,

BARRETT & McNAGNY LLP

By _/s/ Kevin Fitzharris/ccp_____
    Kevin K. Fitzharris, Esq.
    215 East Berry Street
    P.O. Box 2263
    Fort Wayne, IN  46801-2263

Of Counsel:

John R. Gerstein
Gabriela Richeimer
Troutman Sanders LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 274-2950
Fax: (202) 654-5835