| | | |
|---|---|---|
| THE MEDICAL PROTECTIVE COMPANY | ) | |
| OF FORT WAYNE INDIANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:13 CV 357 |
| | ) | |
| AMERICAN INTERNATIONAL SPECIALTY | ) | |
| LINES INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION and ORDER

This matter is before the court on the motion for partial summary judgment filed by plaintiff Medical Protective Company of Fort Wayne, Indiana ("MedPro") (DE # 68), and the motion for summary judgment filed by defendant, American International Speciality Lines Insurance Company ("AISLIC") (DE # 69). Because this court finds that MedPro knew, or should have known, as of June 30, 2005, that its prior failure to settle could lead to a claim or suit, MedPro's motion for partial summary judgment will be denied, and AISLIC's motion for summary judgment will be granted.

## I.     BACKGROUND

### A.     Terms of the Policy

The following facts are not in dispute for purposes of the parties' motions for summary judgment. The plaintiff, MedPro, is a healthcare malpractice insurance company that purchased Insurance Company Professional Liability insurance from AISLIC. (DE # 76 at 3.) Insurance Company Professional Liability insurance is coverage

for insurance companies and their agents for lawsuits alleging professional negligence and/or bad faith claims. (DE # 76 at 1.)

MedPro's first insurance policy from AISLIC covered the period between June 30, 2005, and July 1, 2006 ("the 2005 policy"). (DE # 70-1 at 73.) MedPro subsequently renewed its policy and obtained coverage for the period between July 1, 2006, and July 1, 2007 ("the 2006 Policy"). (*Id.* at 104.) The polices stated, in relevant part:

> **NOTICE: THIS IS A CLAIMS MADE FORM. EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED GENERALLY TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE COMPANY WHILE THE POLICY IS IN FORCE . . . .**

* * * *

### INSURING AGREEMENTS

**1.    PROFESSIONAL LIABILITY**

> To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Insured and reported in writing to the Company during the Policy Period for any Wrongful Act of the Insured or of any other person for whose actions the Insured is legally responsible, but only if such Wrongful Act occurs prior to the end of the Policy Period . . . .

* * * *

### DEFINITIONS

* * * *

**1.    "Insured"** means:

> A.    the entity or entities named in Item 1 of the Declarations;

B.   any past, present, or future director, officer or employee of any entity named in Item 1 of the Declarations, while acting within the scope of their duties as such.

* * * *

7.   **"Wrongful Act"** means any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted.

## EXCLUSIONS

This policy does not apply:

* * * *

m)   **to any claim arising out of any Wrongful Act occurring prior to the inception date of the first Insurance Company's Professional Liability Insurance Policy . . . , if on such first inception date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a claim or suit;**

* * * *

## ENDORSEMENT

* * * *

## AMEND SPECIAL REPORTING CLAUSE ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that SPECIAL PROVISIONS, 4. SPECIAL REPORTING CLAUSE is deleted in its entirety and replaced with the following;

4.   **SPECIAL REPORTING CLAUSE**

If during the Policy Period . . . . , the General Counsel, CEO or CFO shall become aware of any occurrence which may reasonably be expected to give rise to a claim against the Insured for a Wrongful Act which occurred during or prior

> to the Policy Period, and provided the Insured gives written
> notice to the Company during the Policy Period . . . of the
> nature of the occurrence and specifics of the possible
> Wrongful Act, any claim which is subsequently made
> against the Insured arising out of such Wrongful Act shall be
> treated as a claim made during the Policy Period.
>
> ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS
> REMAIN UNCHANGED.

(*Id.* at 73-97, 106-113 (emphasis in original).)

The parties did not define the term "claim" in either of their agreements, giving rise, in large part, to their present dispute.

### B.      *Factual Background for Wrongful Death Lawsuit*

The parties' dispute involves three lawsuits: (1) a 2003 wrongful death lawsuit by the Bramletts - the family of a deceased patient – against MedPro's insured, Dr. Benny Phillips, (the "wrongful death lawsuit"); (2) the Bramletts' subsequent lawsuit against MedPro arising from MedPro's alleged wrongful failure to settle the wrongful death lawsuit; and (3) the present lawsuit, in which MedPro seeks coverage from AISLIC for sums it paid to settle its extra-contractual liability with the Bramletts.

The wrongful death lawsuit arose in May 2003, after Vicki Bramlett died following a laparoscopic hysterectomy performed by Dr. Phillips. (DE # 76 at 5.) Dr. Phillips sought coverage from MedPro under a medical malpractice insurance policy with a coverage limit of $200,000. (*Id.*) The hospital and its nurses were also sued, and settled with the Bramletts in the amount of $2.3 million. (*Id.*)

*Settlement Negotiations Prior to Wrongful Death Trial*

On December 17, 2003, the Bramletts made a settlement demand in the amount of $200,000 - the maximum amount covered by Dr. Phillips' policy with MedPro. (DE # 70-2 at 23-25.) The Bramletts' demand was based on a seminal Texas Supreme Court case, *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. 1929), under which an insurer is liable for any amounts in excess of policy limits if it wrongfully rejects a plaintiff's demand within the policy limit that an ordinarily prudent insurer would have accepted. On March 23, 2004, the Bramletts made a second settlement demand in the amount of $200,00, pursuant to *Stowers*. (*Id.* at 58-59.)

MedPro declined to accept either of the Bramletts' *Stowers* settlement demands. At the time of the demands, MedPro's claims specialist had authority to settle for the $200,000 policy limits without supervisor approval, but declined to settle the case because she wanted to "push" the Bramletts' attorney "into working the case – see if he really wants to put any money and time into it." (DE # 70-1 at 222.) According to MedPro, a *Stowers* demand is made in nearly all of its cases, and typically plaintiffs continue to negotiate settlement within the policy limit, even after the *Stowers* demand has expired. (*Id.* at 5.)

MedPro believed it was too early in the litigation to consider settlement because the parties had not yet taken any depositions. (DE # 76 at 5.) Moreover, its initial case review led it to believe that Dr. Phillips had utilized the appropriate standard of care. (*Id.* at 6.)

At the time of the Bramletts' *Stowers* demands, the hospital and its nurses had already settled with the Bramletts for $2.3 million. Thus, according to MedPro, a jury would have to award the Bramletts more than $2.5 million in order for Dr. Phillips to face any extra-contractual liability. (*Id.* at 6.) MedPro claims that it did not believe such a high verdict was possible because the highest medical malpractice jury verdict in Lubbock, Texas – at that time – was $2 million. At the time of the Bramletts' demands, MedPro's claims specialist estimated the Bramletts' medical damages claim to be approximately $80,000 and their lost wages claim to be approximately $1.5 to $2 million. (*Id.* at 222.)

In May 2004, MedPro assigned a new claims adjuster to the case. (*Id.*) The new claims adjuster noted, "Dr. Phillips understands his low limits create possible excess exposure thus, he would like the case settled." (*Id.* at 221-222.) By this point, the parties had engaged in some discovery and Dr. Phillips had been deposed. During his deposition, Dr. Phillips testified that before he left the hospital to workout with his personal trainer he knew that Mrs. Bramlett had experienced a significant drop in hemoglobin – a sign of internal bleeding. (*Id.* at 170-175, 183.) He testified that if he had checked on Mrs. Bramlett before he left to go to the gym she probably would have survived. (*Id.* at 170.)

On December 28, 2004, Dr. Phillips' personal counsel demanded that MedPro settle the wrongful death lawsuit, even if it had to settle for an amount exceeding Dr. Phillips' policy limits. (*Id.* at 229.) Dr. Phillips' counsel accused MedPro of recklessly

disregarding Dr. Phillips' "severe" exposure in the case, and noted that MedPro's "exposure is likewise severe due to its failure to offer policy limits within the guidelines of the previous two *Stowers* demands from Plaintiffs' counsel." (*Id.*) Dr. Phillips' personal counsel specifically directed MedPro to portions of Dr. Phillips' deposition "wherein [Dr.Phillips], on numerous occasions, admits to violations of the standard of care and concedes issues of causation." (*Id.*) Counsel argued that a jury would most likely impose liability on Dr. Phillips in an amount that greatly exceeded his policy limits, and noted that Dr. Phillips could assign his right to extra-contractual damages against MedPro, to the Bramletts. (*Id.* at 229-230.)

On January 4, 2005, MedPro's trial counsel advised the MedPro claims specialist that Dr. Phillips had a 20% likelihood of obtaining a defense verdict. (DE # 70-2 at 116.) Trial counsel estimated, in the event of an adverse verdict, "the total actual damages to be approximately $3 million." (*Id.*)

In February 2005, the parties attended mediation. (DE # 70-1 at 190.) Prior to the mediation, MedPro offered to settle the case with the Bramletts for $200,000 – Dr. Phillips' policy limit. (*Id.* at 197.) The Bramletts' attorney rejected the settlement offer on the basis that if the case went to trial, the Bramletts were likely to win a large verdict, and MedPro would have to pay the entire verdict because it had rejected the Bramletts' *Stowers* demands. (*Id.* at 146.) MedPro disagreed, believing that the Bramletts had no legal standing or right to bring a claim against MedPro under the *Stowers* doctrine. (DE # 76-4 at 246-247.)

On February 23, 2005, the day before the parties' mediation, MedPro's trial counsel sent the mediator a mediation report that stated, "[t]he primary issue for this mediation is whether Doctor Phillips' insurer, Medical Protective, has been placed in a *Stowers* situation such that it is subject to unlimited liability." (DE # 70-1 at 199-200; DE # 70-2 at 125.) MedPro's counsel testified that the Bramletts' attorney made it clear that he was "absolutely convinced" that MedPro had *Stowers* liability. (DE # 70-1 at 201.) During the mediation, the Bramletts issued a $2.3 million settlement demand, but MedPro maintained its offer of $200,000. (DE # 70-1 at 220.)

The MedPro claims handler who attended the mediation subsequently prepared a summary of the mediation. (*Id.* at 233.) His summary stated that MedPro's trial counsel's reason for refusing the *Stowers* demands was "inadequate" and recommended that MedPro obtain its own counsel to address its *Stowers* liability for wrongful failure to settle. (*Id.* at 233-234.) He also stated that Dr. Phillips "will be found negligent" if the case proceeded to trial, and estimated that MedPro's "exposure could be something just short of $3M plus medical expense[s] less [the Hospital's settlement] credit." (*Id.*)

By April 2005, a MedPro claims supervisor had reported the wrongful death lawsuit and the claim against MedPro for wrongful failure to settle to MedPro's Vice President of Claims. (DE # 70-1 at 4, 40-41; DE # 70-2 at 132.) The claims were also referred to MedPro's legal department, and a MedPro attorney solicited outside legal advice regarding the Bramletts' position that MedPro had been *Stowerized.* (DE # 70-1 at 43-45, DE # 70-2 at 252.) Outside counsel opined that (i) it was not been bad faith for

MedPro to reject the *Stowers* demand to investigate the case further; (ii) the Bramletts had no right or standing to assert an extra-contractual claim against MedPro; and (iii) there was no reason for MedPro to pay extra-contractual damages that had not yet occurred. (DE # 70-2 at 252.)

On June 30, 2005, the 2005 Policy went into effect. (DE # 70-1 at 75.) This opinion is based on the information MedPro knew, or should have known, as of this date.

D.    *Trial*

In August 2005, on the eve of trial, the Bramletts issued a settlement demand of $500,000, which MedPro did not accept. (DE # 70-1 at 54, 209-211.) The case proceeded to trial and the jury returned a verdict in favor of the Bramletts in the amount of $14 million. (*Id.* at 213.) After the trial and jury verdict, Dr. Phillips' personal counsel demanded that MedPro agree to fully protect Dr. Phillips from personal liability, and threatened that if MedPro refused, Dr. Phillips would consider assigning his rights against MedPro to the Bramletts. (DE # 70-1 at 285-291.) MedPro agreed to indemnify Dr. Phillips. (DE # 70-1 at 274-278.)

E.    *Post-Trial Litigation*

In October 2005, after the jury verdict was issued, the trial court held that a Texas statutory damages cap for certain wrongful death cases did not apply to the judgment against Dr. Phillips due to the *Stowers* exception to the statute. *See Bramlett et al. v. Phillips, et al.*, 2005 WL 5108068 (Tex.Dist., Oct. 18, 2005).

On July 1, 2006, the 2006 Policy agreement between MedPro and AISLIC went into effect.

In March 2007, the Texas Court of Appeals affirmed the trial court's rejection of the statutory damages cap because the case "presented facts which would allow the invocation of a '*Stowers*' claim." *Phillips v. Bramlett*, 258 S.W.3d 158, 181 (Tex. App. 2007). MedPro argues that, with this opinion, Texas appellate courts were split for the first time on the correct interpretation of the statutory *Stowers* exception. (DE # 76 at 9.)

In June 2007, MedPro reported to AISLIC for the first time that there was a "potential claim" against it. (DE # 68-3 at 134.) MedPro advised AISLIC: "Plaintiffs made two policy limit demands upon Medical Protective during the discovery of the case, but Medical Protective did not accept. When policy limits were offered, they were rejected, with the plaintiffs suggesting that Med Pro had been 'Stowerized' under Texas law." (*Id.*)

AISLIC investigated the potential claim and stated in a letter to MedPro: "[a]n excess verdict was rendered in the case of Bramlett [v.] Dr. Bennie Phillips. This verdict was appealed and no bad faith claim has been made against MedPro to date." (DE # 68-4 at 149.) According to MedPro, at this point AISLIC knew: (1) that an excess verdict and judgment had been entered against Dr. Phillips; (2) the judgment was being appealed; and (3) the Bramletts had refused to accept policy limits, alleging that MedPro had been *Stowerized* under Texas law. MedPro argues that in spite of this

knowledge, AISLIC explicitly confirmed that the Bramletts had not asserted a claim under the Policy.

Three days later, on July 1, 2007, the 2006 Policy period expired.

In 2009, the Texas Supreme Court reversed the Texas Court of Appeals, holding that the statutory damages cap applied and limited Dr. Phillips' exposure to approximately $1.7 million. *Phillips v. Bramlett*, 288 S.W.3d 876 (Tex. 2009). However, the Texas Supreme Court held that the Bramletts could still pursue a claim against MedPro for the difference between the statutory cap and the jury verdict. *Id.* at 882. MedPro argues that this holding was "unprecedented," and by extension, unforeseeable.

MedPro settled with Dr. Phillips, reflecting its agreement to indemnify him, and paid the Bramletts the amount of the statutory cap, plus interest; approximately $1.7 million.

Three days after the Texas Supreme Court's decision, the Bramletts sued MedPro in federal court for the excess judgment. *Bramlett v. Medical Protective Co. Of Ft. Wayne, Ind.*, No. 3:10-CV-2048-D, 2013 WL 796725 (N.D. Tex. Mar. 5, 2013). The federal court denied MedPro's motion for summary judgment, holding that a jury could find that a reasonable insurer would have accepted the $200,000 *Stowers* demands that the Bramletts issued in 2003 and 2004. *Id.* at *5. MedPro thereafter settled with the Bramletts.

*F.    Procedural Background in the Present Litigation*

In this case, MedPro alleges a breach of contract claim against AISLIC for failure to cover MedPro's extra-contractual liability and eventual settlement of the Bramletts' bad-faith claim. (DE # 1.)

Both parties have filed motions for summary judgment. MedPro seeks summary judgment on three of AISLIC's affirmative defenses, but does not seek a dispositive ruling on the merits of the case itself. (DE # 68 at 1.) AISLIC, on the other hand, moves for summary judgment of MedPro's entire claim. It argues that MedPro is not entitled to coverage under the 2006 Policy because the claim for extra-contractual damages was first made against MedPro before the 2006 Policy incepted. (DE # 69 at 3.) It also argues that even if a claim had not been made against MedPro prior to the inception of the 2006 Policy, it is nevertheless entitled to judgment in its favor because Exclusion M applied to bar coverage. AISLIC argues that by June 30, 2005 – the inception date of the 2005 Policy – MedPro knew or could have reasonably foreseen that its failure to settle with the Bramletts for the policy limits could lead to a claim or suit. (DE # 69 at 4.) Because this court finds that Exclusion M bars coverage of the Bramletts' extra-contractual liability claim, this court need not address AISLIC's first argument that the claim was made prior to the inception of the 2006 Policy, and need not address the merits of MedPro's motion regarding AISCLIC's affirmative defenses.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson*, 477 U.S. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all

legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

## III.    ANALYSIS

### A.    *Exclusion M Applies to Bar Coverage because MedPro Should Have Foreseen the Bramletts' Claim for Extra-Contractual Damages*

"In Indiana, the meaning of an insurance policy is a matter of law, and in general the same rules of construction apply to insurance policies as to other contracts." *Home Fed. Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 729 (7th Cir. 2012).[1] "The insured is required to prove that its claims fall within the coverage provision of its policy, but the insurance provider bears the burden of proving specific exclusions or limitations to policy coverage." *Indiana Funeral Directors Ins. Tr. v. Trustmark Ins. Corp.*, 347 F.3d 652, 654 (7th Cir. 2003) (applying Indiana law) (internal citations omitted).

A 'prior-knowledge exclusion,' like Exclusion M, is designed to "protect[] the insurer against the form of fraud that consists of taking out claims-made insurance after you know or should know that a claim is about to be made against you." *Truck Ins. Exch. v. Ashland Oil, Inc.*, 951 F.2d 787, 791 (7th Cir. 1992). "Like the exclusion of a

---

[1] In the absence from any argument to the contrary, the court will apply Indiana law. "Because the district court sits in Indiana and the parties do not challenge the district court's application of Indiana law, we construe [the] policy in accordance with Indiana law." *Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, 712 F.3d 336, 341 (7th Cir. 2013). *See also Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587 n. 1 (7th Cir. 2012) ("We do not worry about conflict of laws unless the parties disagree on which state's law applies. Further, when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits." (internal quotation marks and citations omitted)).

known preexisting condition from a health insurance policy, the exclusion from a claims-only policy of claims based on conduct that occurred before the policy was issued and that was known to have claim potential is uncontroversially proper." *Id.* The exclusion enables an insurer to better "assess the risk of extending insurance, thereby adjusting premium levels, altering the type of insurance extended, or denying coverage altogether if the insurer believes that such a breach might ripen into a valid malpractice action during the coverage period." *Worth v. Tamarack Am., a Div. of Great Am. Ins. Co.,* 47 F.Supp.2d 1087, 1099 (S.D. Ind. 1999), *aff'd*, 210 F.3d 377 (7th Cir. 2000).

As of June 30, 2005, MedPro certainly knew or could have reasonably foreseen that its prior failure to settle with the Bramletts could lead to a claim or suit, and thus Exclusion M applies and AISLIC was not required to cover the cost of MedPro's settlement of the Bramletts' extra-contractual liability claim. To begin, the facts of Mrs. Bramlett's death are such that MedPro should have known that Dr. Phillips faced liability in excess of his $200,000 policy limit. Mrs. Bramlett was a 36-year old mother of two small children who died after a routine medical procedure. When Mrs. Bramlett experienced a significant drop in hemoglobin, Dr. Phillips ordered additional tests because such a drop indicates that the patient may be bleeding internally. Dr. Phillips testified that if he had checked her lab results before going to work out with his personal trainer, Mrs. Bramlett likely would have survived.

MedPro also knew or should have known that the Bramletts could pursue a claim for extra-contractual damages because the attorneys for the Bramletts and for Dr.

Phillips explicitly told MedPro this was the case. A primary subject of the February 2005 mediation was MedPro's *Stowers* liability. It was apparently clear to all parties at the mediation that the Bramletts' attorney believed that the Bramletts could recover the full amount of a jury verdict from MedPro because it failed to accept the Bramletts' *Stowers* demands. MedPro's own attorney knew at this point that the Bramletts' attorney was "absolutely convinced" that MedPro had *Stowers* liability.

Moreover, Dr. Phillips' counsel continuously demanded that MedPro settle the wrongful death lawsuit, even if MedPro had to settle for an amount exceeding Dr. Phillips' policy limits. Dr. Phillips' counsel accused MedPro of recklessly disregarding the extreme risk of exposure to Dr. Phillips, arguing that a jury would most likely impose liability on Dr. Phillips in an amount that greatly exceeded the policy limits. It was only after counsel repeatedly threatened to assign Dr. Phillips' rights under *Stowers* to the Bramletts, MedPro agreed to indemnify Dr. Phillips for any extra-contractual award the Bramletts obtained against him.

These facts clearly establish that MedPro should have known that the Bramletts might pursue a claim for extra-contractual damages against MedPro.

B.      *Exclusion M Applies to Bar Coverage because MedPro* Did *Foresee the Bramletts' Claim for Extra-Contractual Damages*

MedPro's own actions prior to June 30, 2005, demonstrate that it did, in fact, know of the possibility of a claim by the Bramletts. The MedPro claims specialist who attended the mediation submitted case notes that stated that MedPro's trial counsel's reasons for refusing the *Stowers* demands were "inadequate," and he recommended that

MedPro obtain its own counsel to address its *Stowers* liability for wrongful failure to settle. He warned that Dr. Phillips "will be found negligent" if the case proceeded to trial and opined that case had a verdict value of just short of $3 million, not including medical expenses.

By April 2005, a MedPro claims supervisor had reported both the wrongful death lawsuit and the claim against MedPro for wrongful failure to settle to MedPro's Vice President of Claims. The claims were also referred to MedPro's legal department for evaluation. MedPro's in-house attorney subsequently sought outside legal advice regarding how MedPro should respond to the to the Bramletts' position that MedPro had been *Stowerized*. While outside-counsel opined that MedPro would not be liable under *Stowers*, the fact that MedPro consulted in-house and outside counsel speaks volumes to the fact that it was aware that the Bramletts might pursue a claim or lawsuit for *Stowers* damages against it. That outside counsel believed the claim would not prevail is irrelevant; the question is whether MedPro should have known a claim was possible.

This case is analogous to *Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, where an insured law firm brought an action against its legal malpractice insurer because its insurer refused to cover a malpractice claim made against the law firm. 712 F.3d 336 (7th Cir. 2013). The question before the Seventh Circuit was whether the insured knew or should have reasonably known at the time that it renewed its malpractice insurance that its negligent conduct might give rise to a claim. Like

Exclusion M, the parties' insurance policy "expressly precluded coverage for unreported actions or omissions predating the policy period where, 'before the Policy effective date,' the law firm 'knew, or should reasonably have known, of any circumstance, act or omission that might reasonably be expected to be the basis of that Claim.'" *Id.* at 340. The insurer argued that the law firm should have known that it had committed an omission that could reasonably give rise to a claim prior to the original policy's inception, and thus was not entitled to coverage.

The Seventh Circuit affirmed the district court's grant of summary judgment in favor of the liability insurer. *Id.* at 345. The Seventh Circuit held that the law firm could have reasonably anticipated that its acts or omissions could give rise to a claim because: (i) a real estate contract fell through due to the firm's omissions; (ii) the seller from the failed transaction threatened to file a lawsuit; and (iii) the seller subsequently filed an action for a declaratory judgment that no contract existed. *Id.* at 343. The Court rejected the law firm's defense that it did not believe the seller's suit would be successful, holding that the ultimate success of the lawsuit was irrelevant. "The question is whether Koransky & Bouwer had reason to believe that their acts or omissions *may* result in a claim for malpractice. Because Koransky & Bouwer knew that Seller was refusing to go through with the deal as a result of the law firm's failure to deliver the executed contract, it had such knowledge." *Id.* at 343 (emphasis in original).

The same is necessarily true in this case. Even if MedPro believed that any lawsuit by the Bramletts would be dismissed for want of standing, the fact remains that it knew such a lawsuit was a possibility.

MedPro attempts to distinguish *Koransky* (and other cases cited by AISLIC) on the basis that, "[t]he Policy defines Wrongful Act as a 'breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted' – as opposed to an **alleged** breach of duty or its ilk." (DE # 76 at 22-23 (emphasis in original).) MedPro's conclusion that the parties' agreements in this case did not cover both claims *and* alleged wrongful actions or omissions can only be the result of an intentionally selective reading of the agreements. Exclusion M explicitly precludes coverage for Wrongful Acts that could lead to a claim *or* suit, and thus expressly differentiates between claims and lawsuits. While the parties did not define the term "claim" in their agreements, it is clear that a claim encompasses allegations outside of formal legal pleadings.

### C.  *Foreseeability of Extra-Contractual Damages*

MedPro argues that it was not reasonably foreseeable that Dr. Phillips would face extra-contractual liability because he would only face such liability if the jury returned an unprecedentedly high verdict. MedPro argues that, prior to this case, the highest medical malpractice verdict issued by a jury in Lubbock, Texas, was $2 million. It claims that it reasonably believed Dr. Phillips would not face extra-contractual

liability because the hospital's settlement with the Bramletts afforded Dr. Phillips a $2.3 million "cushion."

MedPro's argument flies in the face of its own attorney's evaluation of the case. In January 2005, MedPro's counsel estimated a potential jury verdict of up to $3 million. Thus, according to its own attorney, Dr. Phillips faced up to $500,000 in personal exposure, and up to $300,000 in extra-contractual liability. Therefore, because MedPro knew that Dr. Phillips might be liable for extra-contractual damages, it was obligated to report that possibility to AISLIC if it wanted to preserve its coverage of a future claim.

    D.     *Foreseeability of the Bramletts' Claim for Extra-Contractual Damages*

MedPro argues that while it may have been foreseeable that Dr. Phillips could make a claim for extra-contractual damages, it was not foreseeable that the Bramletts could do the same. It argues that Exclusion M does not apply to bar coverage because it could not have foreseen the "unprecedented" Texas Supreme Court's holding in 2009 that the Bramletts could pursue a claim for extra-contractual damages against MedPro. (DE # 76 at 19.) MedPro argues that, prior to this ruling, the Bramletts had neither legal standing nor right to bring a claim against MedPro. (*Id.*) As discussed above, the evidence demonstrates that MedPro did fear potential liability to the Bramletts because it sought advice from outside counsel regarding this very possibility. While outside counsel opined that the Bramletts would not have standing, that is irrelevant. It matters only that it was reasonably foreseeable that the Bramletts would try.

Moreover, MedPro's argument suggests that because such an action for damages had not previously been made, it *could not* have been made. This is a logical fallacy. Simply because a legal theory is novel does not mean that it is unforeseeable – particularly when opposing counsel has explicitly threatened to pursue that novel theory, as was the case here.

In support of its argument that the Bramletts' suit was unforeseeable, MedPro makes much ado about the fact that after it notified AISLIC of the $14 million jury verdict against Dr. Phillips in June 2007, AISLIC examined the issue and concluded that the Bramletts had not yet pursued a claim against MedPro. This too is irrelevant. The question when looking at Exclusion M's coverage preclusion is what *MedPro* knew, or should have foreseen, as of June 30, 2005. What AISLIC concluded two years later, when it had finally been notified of the claim, is not relevant in determining the application of Exclusion M.

Finally, MedPro's argument that it could not have foreseen the Bramletts' 2009 action is unpersuasive is because the very theory that the Texas Supreme Court applied to permit the Bramletts to sue MedPro – the theory MedPro claims was novel and unforeseeable – was first applied by the Texas Supreme Court in a similar context more than a decade earlier, in 1992.

In deciding the Bramletts' claim, the Texas Supreme Court relied on its holding in *American Centennial Insurance Co. v. Canal Insurance Co.*, 843 S.W.2d 480 (Tex. 1992). The Court held that the theory of equitable subrogation that was applied in *Canal* also

permitted the Bramletts to pursue a direct action against MedPro. *Phillips v. Bramlett*, 288 S.W.3d 876, 882 (Tex. 2009). In *Canal*, the insured's purchase of an excess insurance policy operated like the Texas statutory cap at issue in the Bramlett case, and "potentially skew[ed] the primary insurer's duty to settle with reasonable care." *Id.*

The question in *Canal* was whether "an excess insurance carrier has a cause of action against a primary carrier and trial counsel for mishandling a claim." *Canal*, 843 S.W.2d at 481. The Court held that *Stowers* extends to permit such an action. *Id.* The Court's holding was based on its determination that, in such situations, the insured was fully protected and had little incentive to enforce the primary carrier's duties; therefore, the excess insurance carrier, as the party that actually suffered the loss, should be permitted to file an action for damages pursuant to the doctrine of 'equitable subrogation.' *Id.* at 483. The Court found that allowing the party who actually suffers the loss to enforce the primary insurer's duty to settle serves the public interest by discouraging primary insurers from "gambling" with the excess carrier's money. *Id.*

The *Phillips* Court found that the same reasoning applied to permit the Bramletts to pursue *Stowers* damages from MedPro. "The *Stowers* exception to the cap is like this right to equitable subrogation. It puts the injured third party in the shoes of the insured to the extent the cap eliminates the insured's incentive to enforce the insurer's duty to settle with reasonable care." *Phillips*, 288 S.W.3d at 882.

The Texas Supreme Court did not announce an unforeseeable legal precedent when it determined that the Bramletts had standing to sue MedPro for its wrongful

failure to settle the Bramletts' claim. Rather, the Court utilized decade-old precedent. In light of the reasoning in *Canal*, it was foreseeable that a third-party, such as the Bramletts, could assert a claim for *Stowers* liability against MedPro.

E.     *Occurrence Policies versus Claims-Made Policies*

MedPro argues that the Special Reporting Clause Endorsement transformed the policies from 'claims-made' policies to 'occurrence' policies. (DE # 68 at 24.) It argues that this endorsement provided an additional, substantive grant of coverage, and entitled MedPro to coverage so long as its CEO, CFO, or General Counsel first discovered an occurrence that could lead to a claim and reported that claim within the reporting period – *even if* other MedPro employees were on notice of the potential claim prior to the reporting period and had not reported it. (*Id.* at 23-24.) MedPro argues, in essence, that the Special Reporting Clause Endorsement trumps Exclusion M's limitations on coverage.

Occurrence policies, "insure against a negligent or other liability-causing act or omission that occurs during the policy period regardless of when a legal claim arising out of the act or omission is made against the insured," creating "indefinite future liability." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Baker & McKenzie*, 997 F.2d 305, 306 (7th Cir. 1993). Claims-made policies, on the other hand, "limit coverage to claims made during the policy period." *Id. See also Truck Ins. Exch. v. Ashland Oil, Inc.*, 951 F.2d 787, 790 (7th Cir. 1992).

MedPro's attempt to expand its claims-made policies into occurrence-based policies is unavailing, for several reasons. To begin, the policies explicitly state, "**THIS IS A CLAIMS-MADE POLICY**."(DE # 70-1 at 73, 104 (emphasis in original).) The Special Reporting Clause Endorsement was explicitly limited to amending the form version of the Special Reporting Clause – which applied to "any Insured" – to instead apply only to MedPro's General Counsel, CEO, and CFO. The Special Reporting Clause Endorsement explicitly states, "ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED." (DE # 68-3 at 65 (emphasis in original).) In light of the plain language of the policies, MedPro's position that the amendment of the Special Reporting Clause somehow granted it additional coverage is baffling. The amendment limited the persons to which the original Special Reporting Clause applied - it did nothing else to change the nature of the original clause.

It is unclear why MedPro would advocate that the policies were occurrence policies. The occurrence at issue, the wrongful failure to settle with the Bramletts, took place prior the inception of the 2005 Policy. Thus, while occurrence policies provide indefinite future coverage for events that took place within the policy period, the event at issue did not take place within the 2006 policy period (the period in which it was reported to AISLIC), and thus would not be covered in any event.

The function of both the Special Reporting Clause and the Special Reporting Clause Endorsement was to identify *which* policy a future, foreseeable claim would provide coverage; it does not determine *whether* the claim shall be covered. Where a

claim is "not an actual claim but 'merely the reasonable expectation of a future claim'—the insured has a choice of either (1) accelerating the claim to the current policy period by giving notice to the insurance company during that period, or (2) waiting until an actual claim is filed and relying on the insurance coverage in effect at that time." *Nat'l Union* in *Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 139 (7th Cir. 1994). *See also Nat'l Union*, 997 F.2d at 306. Thus, accepting the premise that MedPro's General Counsel, CEO, or CFO, first discovered an occurrence (its failure to settle with the Bramletts) during the 2006 policy period which could reasonably be expected to give rise to a claim against MedPro for a Wrongful Act (its *wrongful* failure to settle with the Bramletts), MedPro had the choice (pursuant to the Special Reporting Clause Endorsement) to accelerate its expectation of a claim into an actual claim by reporting it during the 2006 policy period. Alternatively, it could wait to report the claim until it was asserted, which according to MedPro occurred in 2009. MedPro would have the analysis stop there. Yet, this is only the first part of the analysis. The second part of the analysis is to determine whether the claim was actually covered under the 2006 Policy. As discussed in a previous section, the claim was not covered because Exclusion M applied to bar coverage.

Thus, MedPro's assertions to the contrary, the Special Reporting Clause Endorsement and Exclusion M are not in conflict, and this court declines MedPro's request to read Exclusion M out of the policies. *See Allgood v. Meridian Sec. Ins. Co.*, 836

N.E.2d 243, 2447 (Ind. 2005) ("Interpretation of the contract should harmonize its provisions, rather than place the provisions in conflict.").

F.     *Relevance of MedPro's Application for Coverage*

MedPro argues that AISLIC's decision to strike Question 28 from MedPro's renewal application for coverage is evidence that the parties intended the 2006 Policy to provide MedPro coverage for claims first made against it prior to the inception of that policy. Question 28 of AISLIC's form application for renewal asks applicants whether any "Professional Liability (E&O) judgments, settlements, payments, claims or suits seeking punitive or exemplary damages, or extracontractual liability [have] been made during the past five years against the Applicant or any of its past or present directors, officers, employees, or any predecessors in business . . . It is agreed that claims made prior to the inception of the policy period are excluded from this proposed coverage." (DE # 68-3 at 123.) MedPro claims that the omission of this question from the renewal application is "telling" and indicates the parties' intent that MedPro not be required to report such prior incidents under the renewed policy. This is, in a word, absurd. What MedPro omits to mention in its argument to the court is that MedPro asked to strike the question from the renewal policy on the basis that the question was "not relevant to the renewal." (DE # 68-3 at 72.)  AISLIC agreed. (*Id.*) The question was, of course, not relevant to the renewal because those claims would either (1) have already been reported; or (2) would not have been covered under the terms of the policy anyway. It is absurd for MedPro to now argue that the omission of this question from the

26

application somehow indicates that the parties intended that past, unreported claims could nevertheless be covered under the policy.

MedPro argues, "[a]n insurer's rejection of a policy limits demand - when well-reasoned and considered as MedPro's was here - should not trigger an obligation to report an actual or potential claim to the insurer's ICPL carrier, or the application of a narrow prior knowledge exclusion like [AISLIC's] Exclusion M." (DE # 76 at 25.) Yet, this is *precisely* what it agreed to do when it entered into the 2005 and 2006 policy agreements with AISLIC. Exclusion M required MedPro to report actual or potential claims to AISLIC if it wanted coverage of those claims. Whether MedPro's evaluation of the merits of the claim was 'well-reasoned and considered' did not relieve it of its obligation to report the claim or potential claim. Because it failed to do so, MedPro was not entitled to coverage and AISLIC is entitled to judgment as a matter of law. *See Nat'l Union*, 997 F.2d 305 (professional liability insurer was not required to provide coverage where attorneys received letters informing them of impending claim, but attorneys did not report claim to insurer; letters gave attorneys notice of actual claim and reasonable expectation of future claim under the policy).

## IV.    CONCLUSION

For these reasons, the court **DENIES** plaintiff MedPro's motion for partial summary judgment (DE # 68); **GRANTS** defendant AISLIC's motion for summary judgment (DE # 69); and **DIRECTS** the Clerk to **ENTER FINAL JUDGMENT** stating:

> Judgment is entered in favor of defendant American International
> Specialty Lines Insurance Company and against plaintiff The

Medical Protective Company of Fort Wayne, Indiana, who shall take nothing by way of its complaint.

**SO ORDERED.**

Date: March 9, 2018

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT