**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| THE MEDICAL PROTECTIVE COMPANY OF FORT WAYNE INDIANA, | |
| Plaintiff, | |
| v. | CAUSE NO.: 1:13-CV-357-HAB |
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, | |
| Defendant. | |

**AMENDED OPINION AND ORDER**

In this litigation, Plaintiff Medical Protective Company of Fort Wayne, Indiana (MedPro), has sued Defendant American International Specialty Insurance Company (AISLIC), now known as AIG Specialty Insurance Company, for breach of the terms of a 2006 professional liability policy AISLIC issued to MedPro (the Policy). MedPro alleges that AISLIC breached the Policy when it refused to cover MedPro's extra-contractual liability and eventual settlement of a third party's claim against MedPro arising out of its handling of a medical malpractice claim against MedPro's insured, Dr. Benny Phillips.

This matter is set for a four-day jury trial to begin on January 28, 2020. The outstanding issue upon which the breach of contract claim will depend is whether Exclusion (m) of the Policy applies.

The Court previously issued an Opinion that was intended to resolve a matter of contract interpretation related to coverage. The Court, on December 10, 2019, issued an

Opinion [ECF No. 125] concluding that, based on the undisputed facts, the claim underlying this breach of contract action was not "first made against the Insured" before the Policy incepted. In response to another of this Court's orders, on January 15, 2020, AISLIC submitted an Offer of Proof [ECF No. 145], setting forth the evidence and testimony that it would introduce at trial on the issue of whether a claim was first made against MedPro for its failure to settle prior to July 1, 2006. On January 16, 2020, the Court also heard the argument of counsel for both parties as it pertained to the offer of proof and the claims "first made" issue. Additionally, on January 20, 2020, MedPro filed its Response to Defendant's "Offer of Proof" [ECF No. 149].

The Court's previous ruling on when a claim was first made was an interlocutory order. As such, the Court has discretion to reconsider or to make a different determination. For the sake of clarity, this Amended Opinion and Order is the controlling decision on that issue.

## BACKGROUND

In 2002, thirty-six-year-old Vicki Bramlett died from complications following routine surgery she underwent in Texas. Mrs. Bramlett's family sued Dr. Phillips, the physician who performed the surgery, and the hospital and nurses who provided post-surgery care. MedPro insured Dr. Phillips for medical malpractice. MedPro twice declined to settle the Bramlett's case for the insurance policy limit, $200,000.

The first demand for settlement was made on December 17, 2003. A second demand was made on March 23, 2004. The Bramletts' demand for the policy limit was based on a seminal Texas Supreme Court case, *G.A. Stowers Furniture Co. v. American*

*Indemnity Co.*, 15 S.W.2d 544 (Tex. 1929), under which an insurer is liable to its insured for any amounts in excess of policy limits if it wrongfully rejects a plaintiff's demand within the policy limit that an ordinarily prudent insurer would have accepted.

In late August 2005, a jury awarded a $14 million verdict in favor of the Bramletts. In October 2005, the trial court entered a judgment in excess of the statutory cap. While the case was on appeal, MedPro reported to AISLIC that there was a potential claim against it based on Texas law. That was in June 2007, just before the Policy was set to expire. AISLIC responded to the report, stating that no bad faith claim had yet been made against MedPro, and that it was reserving its rights.

Later, in 2009, the Supreme Court of Texas ruled that a statutory cap on liability damages applied to limit Dr. Phillips' exposure. The Texas Supreme Court, for the first time, also reconciled the statutory *Stowers* exception to the cap by holding that the *Stowers* exception was similar to a right to equitable subrogation. *Phillips v. Bramlett*, 288 S.W.3d 876, 882 (Tex. 2009). In other words, it put "the injured third party in the shoes of the insured to the extent the cap eliminates the insured's incentive to enforce the insurer's duty to settle with reasonable care." *Id.*[1]

As a result, the Bramletts could pursue a direct claim against MedPro for the difference between the jury verdict and the statutory cap. Three days after the Texas

---

[1] This *Stowers* Exception claim cannot function like an equitable subrogation claim because there will be instances in which there is no claim for the injured third party and the insured physician to "share." For example, Dr. Phillips could only pursue a traditional *Stowers* claim up to the cap. Any recovery by a third party for damages above the cap must come as a result of a direct action. *See id.* ("When insurance coverage is above the cap, . . . the physician is fully protected, and only the injured third party has incentive to pursue the statutory Stowers exception.").

Supreme Court decision, Mrs. Bramlett's family sued MedPro for the excess verdict (the Bramlett Direct Action). MedPro settled the claim. MedPro also settled with Dr. Phillips pursuant to a previous agreement to indemnify him.

AISLIC declined to cover MedPro's settlement with the Bramletts, leading MedPro to sue AISLIC for breach of contract.

**ANALYSIS**

"Insurance contracts are governed by the same rules of construction as other contracts, and the proper interpretation of an insurance policy, even if it is ambiguous, is generally a question of law appropriate for summary judgment." *Wellpoint, Inc. v. Nat'l Union Fire Ins. Co.*, 952 N.E.2d 254, 258 (Ind. Ct. App. 2011); *see also Bar Plan Mut. Ins. Co. v. Likes Law Office, LLC*, 44 N.E.3d 1279, 1285 (Ind. Ct. App. 2015) (stating that interpretation and construction of contract provisions are questions of law). When the facts of the case are not in dispute, what constitutes proper notice under a claims-made policy is a question of law for the court to decide. *Id.*; *see also Imperial Cas. & Indem. Co. v. Chi. Hous. Auth.*, 987 F.2d 459, 461 (7th Cir. 1993) ("If the facts surrounding notice are not disputed, a question of law is presented that may be answered on summary judgment.").

Courts "review the contract as a whole, attempting to ascertain the parties' intent and making every attempt to construe the contract's language so as not to render any words, phrases, or terms ineffective or meaningless." *Bar Plan Mut.*, 44 N.E.3d at 1285 (internal quotation marks omitted). When terms are clear and unambiguous, the court applies the plain and ordinary meaning of the terms and enforces the contract according to its terms. *Id.*

"Under Indiana law, an insurance policy is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language." *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985). If there is an ambiguity in the contract, its terms should be interpreted most favorably to the insured and "to further the policy's basic purpose of indemnity." *Id.*

**A.   Relevant Policy Language**

MedPro's Policy with AISLIC stated, in relevant part:

> **NOTICE: THIS IS A CLAIMS MADE FORM. EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED GENERALLY TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE COMPANY WHILE THE POLICY IS IN FORCE . . . .**
>
> \* \* \* \*
>
> **INSURING AGREEMENTS**
>
> **1. PROFESSIONAL LIABILITY**
>
> To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Insured and reported in writing to the Company during the Policy Period for any Wrongful Act of the Insured or of any other person for whose actions the Insured is legally responsible, but only if such Wrongful Act occurs prior to the end of the Policy Period and occurs solely in the rendering of or failure to render Professional Services.

(Policy, ECF No. 148-1 at 4.) With respect to any Wrongful Act insured according to the Professional Liability provision, AISLIC would "have the right but not the duty to assume the defense of any claim or suit against the Insured." (*Id.*)

The Special Provisions section of the Policy included a provision, titled Loss Provisions, that required MedPro, "as a condition precedent to the availability of the rights provided under this policy" to "give written notice to the company as soon as practicable during the Policy Period . . . of any claim made against the Insured." (ECF No. 148-1 at 8.) However, a Special Reporting Clause, amended by Endorsement No. 16 provided:

> If during the Policy Period . . . . , the CFO, General Counsel or CEO shall become aware of any occurrence which may reasonably be expected to give rise to a claim against the Insured for a Wrongful Act which first occurs during or prior to the Policy Period, and provided the Insured gives written notice to the Company during the Policy Period . . . of the nature of the occurrence and specifics of the possible Wrongful Act, any claim which is subsequently made against the Insured arising out of such Wrongful Act shall be treated as a claim made during the Policy Period.
>
> ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS SHALL REMAIN THE SAME.

(ECF No. 148-1 at 28.)

The Policy contained an exclusion (Exclusion (m)), which stated that the Policy did not apply:

> to any claim arising out of any Wrongful Act occurring prior to the inception date of the first Insurance Company's Professional Liability Insurance policy . . . , if on such first inception date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a claim or suit.

(ECF No. 148-1 at 6). Wrongful Act was defined as "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted." (ECF No. 148-1 at 5.)

**B.      Timing of MedPro's Claim**

Neither party disputes that the Bramlett Direct Action satisfies the definition of a claim or that the Wrongful Act at issue is the rejection of the two *Stowers* settlement demands. AISLIC, however, argues that there is no coverage for this extra-contractual damages claim because it was not "first made" during the Policy period, July 1, 2006, to July 1, 2007. Rather, AISLIC argues, the Bramlett Direct Action relates back to claims first made against MedPro prior to inception of the 2006 AISLIC Policy.

Claim is not defined in the Policy. That does not mean that the term is ambiguous, as "[t]he term claim is one of the commonest terms in the law." *Ins. Co. of Am. v. Dillon, Hardamon & Cohen*, 725 F. Supp. 1461, 1468 (N.D. Ind. 1988). In a "claims made" policy, coverage is linked to the claim and notice rather than to the date of the tort injury. *Paint Shuttle, Inc. v. Cont'l Cas. Co.*, 733 N.E.2d 513, 522 (Ind. Ct. App. 2000). In a claims-made insurance policy, the term "claim" is universally understood to mean a "demand for money or property or some specific remedy." *Dillon*, 725 F. Supp. at 1469; *see also* 3 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition § 16.07[5][b] (2014) (explaining that where the term "claim" is undefined in a claims-made policy, it "has generally been defined as a demand for money or services" and that a "frequently-quoted definition of 'claim'" is "an assertion of a legal right") (internal quotation marks omitted).

AISLIC has identified several developments in Dr. Phillips' medical malpractice case that, it contends, qualify as a claim. It first identifies a December 2004 letter from Dr. Phillips' personal counsel, Neville Manning, demanding that MedPro engage in settlement negotiations with the Bramletts and settle the underlying medical malpractice

7

action on behalf of its insured for amounts in excess of the policy limits and, thus, eliminate the need for trial. Manning stated his position that MedPro was liable for any amounts that a jury found in excess of the policy.

AISLIC also identifies a claim from the Bramletts' attorney, Alex Klein, during mediation in February 2005. Klein argued that MedPro was liable for extra-contractual damages above Dr. Phillips' policy limits because it wrongfully rejected the two previous *Stowers* demands. Klein rejected MedPro's $200,000 policy limits settlement offer and demanded $2.3 million.

After this mediation, Manning demanded that MedPro settle the malpractice claim for $2.3 million, the Bramletts' lowest present settlement demand. He accused MedPro of exposing Dr. Phillips to certain financial disaster and noted that MedPro had, in essence, become the excess insurer. Manning concluded that MedPro's conduct was in bad faith. His letter was "an additional demand upon Medical Protective to negotiate in good faith with [the Bramletts] regarding their demands for settlement in excess of the policy limits." (ECF No. 145-2 at 3.)

In September 2005, after a jury returned an excess verdict, a different attorney for Dr. Phillips, John Simpson, accused MedPro of breaching a duty to its insured in rejecting the *Stowers* demands. He explained that the judgment was likely to exceed the limits of Dr. Phillips' policy, putting his assets at risk. He also explained that if Dr. Phillips pursued a *Stowers* case, he would be entitled to common law damages, which would exceed the amount of any judgment. Simpson demanded that MedPro protect Dr. Phillips

8

from liability. In doing so, it would avoid a *Stowers* suit. If MedPro chose not to indemnify or protect Dr. Phillips, he would explore the option of assigning any claims he may have.

Around this same time, Klein demanded $6.9 million, noting that the judgment on the jury verdict provided that the statutory cap on damages would not apply to limit MedPro's *Stowers* liability.

The problem with defining any of the above demands as a claim under the Policy is that they do not implicate AISLIC's Policy with MedPro. The demands described above were for damages based upon Dr. Phillips' alleged malpractice, not for MedPro's wrongdoing. Any sums that would have been paid in response to what Dr. Phillips did, and demands made of Dr. Phillips (and by extension his medical malpractice insurer), are not risks covered by the AISLIC Policy. The Professional Liability coverage provision of the Policy only granted MedPro coverage for "sums which [MedPro] shall become legally obligated to pay as damages resulting from any claim or claims . . . for any Wrongful Act of [MedPro]." The Court finds that under the plain wording of the Policy, considered as a whole, "a claim that a wrongful act has occurred is not the same thing as a claim for payment on account of a wrongful act." *MGIC Indem. Corp. v. Home State Sav. Ass'n*, 797 F.2d 285, 288 (6th Cir. 1986). ("The existence of claims 'of' wrongful acts does not of itself mean that claims were made against the officials 'for' the wrongful acts.")

> The agreement, as we read it, is speaking not of a claim that wrongdoing occurred, but a claim for some discrete amount of money owed to the claimant on account of the alleged wrongdoing. In context, it seems to us, the only kind of "claim or claims" that could trigger the insurer's obligation to pay would be a demand for payment of some amount of money.

*Id.*

9

This distinction, although subtle on paper, has drastically different consequences for insurance coverage. AISLIC does not insure Dr. Phillips. Any discrete amounts requested of Dr. Phillips and in settlement of his wrongdoing, even if agreed to by MedPro out of concern of future potential liability arising out of a claim for its wrongdoing in the handling of the medical malpractice litigation, are not claims alleging damages payable under the Policy. That MedPro's actions gave Dr. Phillips and the Bramletts leverage to argue that it was in MedPro's best interest to settle the claims being made against Dr. Phillips did not convert those settlement demands into claims "for a Wrongful Act" against MedPro. It is not surprising that Dr. Phillips or the Bramletts would use this threat of future action to attempt to obtain a more favorable result in their current litigation, without the need to file legal action later down the road.[2] Nothing in the Policy suggests that AISLIC would have had a right to take over and defend against the demands being made by Dr. Phillips and the Bramletts that MedPro settle the medical malpractice claim for more than Dr. Phillips' policy limits.

The post-verdict, pre-judgment, letter from Attorney Simpson, dated September 20, 2005, posed two options to MedPro: (1) protect Dr. Phillips from any excess judgment

---

[2] AISLIC's Offer of Proof includes testimony that witnesses would offer on the "claims first made issue." Much of that testimony explains how MedPro could become responsible for payment of the excess verdict. Other testimony challenges the wisdom of MedPro's actions in its representation of Dr. Phillips throughout the medical malpractice claim. The wisdom of MedPro's actions are, of course, not indicative of when a claim was asserted against it. That MedPro's own actions during the handling of the litigation on behalf of its insured permitted the Bramletts, after a change in the law, to sue MedPro to recover the amount of the verdict that exceeded the cap does not alter the timing of that claim.

and continue to defend Dr. Phillips through appeal, or (2) refuse to defend and indemnify Dr. Phillips and risk an assignment of rights to the Bramletts so they could sue MedPro for the excess verdict. MedPro chose the first option. Accordingly, Dr. Phillips did not pursue any other contractual or extra-contractual remedies against MedPro.

This letter is not a claim for purposes of the Policy. It highlights how a claim might arise if MedPro refused to defend and indemnify Dr. Phillips, and judgment was entered against him. MedPro's response to indemnify Dr. Phillips eliminated the potential that he could make such a claim or assign his rights to the Bramletts. No matter how much MedPro's actions or the circumstances that developed in the medical malpractice claim against Dr. Phillips set up a scenario that could lead to a claim against MedPro for its failure to settle within policy limits when it had the opportunity, it did not convert the settlement demands in that action into claims against MedPro under its professional liability policy. Neither did it convert any subsequent payments in settlement of the judgment against Dr. Phillips into a claim against MedPro.

In the end, the Bramletts had no ability to pursue a direct action against MedPro for damages arising out of its failure to settle within policy limits until 2009, when the Texas Supreme Court created the right. Any expectations that the Bramletts had during the pendency of the wrongful death malpractice suit against Dr. Phillips were expectations of a future claim.

MedPro was only required to give AISLIC notice of claims made against it. A separate provision, Exclusion (m), would bar coverage if the claim was one that arose out of a Wrongful Act that MedPro "knew or could have reasonably foreseen . . . could lead

11

to a claim or suit" when it first obtained the Policy. (Policy, Exclusion (m), ECF No. 148-1 at 6.)

C.     **Special Provision 1, Limits of Liability**

AISLIC argues that its interpretation of a claim is supported by Special Provision 1, titled "Limits of Liability." That provision provides:

> The limit of liability stated in the Declarations as applicable to "Each Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts" is the limit of the Company's liability for all amounts payable hereunder in settlement or satisfaction of claims, judgments or awards and Defense Costs, Charges, and Expenses arising out of the same Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts, without regard to the number of Insureds, claims demands, suits or proceedings or claimants. If additional claims are subsequently made which arise out of the same Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts as claims already made and reported to the Company, all such claims, whenever made, shall be considered first made within the Policy Period . . . in which the earliest claims arising out of such Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts was first made and reported to the Company, and all such claims shall be subject to one such limit of liability.

(ECF No. 148-1 at 7.) MedPro argues that this is merely an anti-stacking provision, which has no bearing on whether separate claims are considered a "single claim."

A plain reading of the Limits of Liability provision reveals that its purpose is to limit coverage to $5 million for each Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts, no matter how many claims arise out of that Wrongful Act. The provision has no implication on whether the demands for settlement or indemnification in Dr. Phillips medical malpractice litigation were "claims" against MedPro for which the Policy would afford insurance coverage. Rather, the provision's inclusion of language on timing is intended to determine which policy applies if multiple

12

claims arising out of one Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts span more than one policy period. "[A]dditional claims" made subsequent to earlier claims that were "already made and reported" are treated as if they were made in the same reporting period as the earliest claims.

## CONCLUSION

For the reasons stated above, the Court concludes that, as a matter of law, a claim was not first asserted against MedPro for its failure to settle for policy limits before the Policy incepted on July 1, 2006. MedPro's breach of contract claim is, therefore, not based on an assertion of coverage for a claim first made against it prior to the inception of the Policy.

SO ORDERED on January 22, 2020.

                                            s/ *Holly A. Brady*
                                            JUDGE HOLLY A. BRADY
                                            UNITED STATES DISTRICT COURT