# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

March 31, 2021

To:      Robert N. Trgovich
         UNITED STATES DISTRICT COURT
         Northern District of Indiana
         Fort Wayne , IN 46802-0000

| No. 20-1831 | MEDICAL PROTECTIVE COMPANY OF FORT WAYNE, INDIANA, Plaintiff - Appellee<br><br>v.<br><br>AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, now known as AIG SPECIALTY INSURANCE COMPANY, Defendant - Appellant |
|---|---|
| **Originating Case Information:** | |
| District Court No: 1:13-cv-00357-HAB<br>Northern District of Indiana, Fort Wayne Division<br>District Judge Holly A. Brady | |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:           No record to be returned

NOTE TO COUNSEL:
If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period

will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

Date:                                    Received by:

_____          _____

form name: c7_Mandate(form ID: 135)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

CERTIFIED COPY
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

March 9, 2021

Before:      FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

|  |  |
|---|---|
| No. 20-1831 | THE MEDICAL PROTECTIVE COMPANY OF FORT WAYNE, INDIANA, <br> Plaintiff - Appellee <br><br> v. <br><br> AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, now known as AIG SPECIALTY INSURANCE COMPANY, <br> Defendant - Appellant |
| **Originating Case Information:** | |
| District Court No: 1:13-cv-00357-HAB <br> Northern District of Indiana, Fort Wayne Division <br> District Judge Holly A. Brady | |

The judgment of the District Court is **AFFIRMED**, with costs, in accordance with the decision of this court entered on this date.

form name: **c7_FinalJudgment**(form ID: **132**)

In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

No. 20-1831

THE MEDICAL PROTECTIVE COMPANY OF FORT WAYNE,
INDIANA,

*Plaintiff-Appellee,*

*v.*

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE
COMPANY, now known as AIG SPECIALTY INSURANCE
COMPANY

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 13-cv-357 — **Holly A. Brady**, *Judge.*

———————————

ARGUED DECEMBER 8, 2020 — DECIDED MARCH 9, 2021

———————————

Before EASTERBROOK, KANNE, and HAMILTON, *Circuit
Judges.*

KANNE, *Circuit Judge.* The Medical Protective Company of
Fort Wayne ("MedPro") sued its insurer, American Interna-
tional Specialty Lines Insurance Co., now known as AIG

Specialty Insurance ("AISLIC"),[1] for breach of contract after AISLIC refused to indemnify MedPro for payment that it made to settle a claim. The jury handed down a verdict in favor of MedPro. AISLIC now appeals two of the district court's decisions that allowed the case to go to trial at all.

In AISLIC's view, our earlier interpretation of the policy at issue requires us to hold that MedPro never committed a "Wrongful Act" necessary to invoke coverage. Further, AISLIC contends that MedPro cannot invoke coverage because the claim that it settled was brought before the policy period began.

We disagree. The district court properly interpreted the policy in MedPro's favor, and it did not err when it concluded that MedPro's claim was timely brought. Thus, the verdict in MedPro's favor stands.

## I. BACKGROUND

The background of this case was comprehensively detailed in our prior opinion, *Medical Protective Co. of Fort Wayne, Indiana v. American International Specialty Lines Insurance Co.*, 911 F.3d 438 (7th Cir. 2018). We repeat only the pertinent facts here.

### A. Factual and Procedural History

The events that sparked the underlying suit began in October 2002, when Dr. Benny Phillips performed a laparoscopic hysterectomy on thirty-six-year-old Vicki Bramlett, and she died from complications a few days later. In 2003, Bramlett's

---

[1] Recognizing that this court in its prior opinion and the parties in their filings refer to AIG Specialty Insurance as "AISLIC," we continue that practice for consistency.

No. 20-1831                                                      3

husband and children brought a wrongful death suit in Texas state court against Dr. Phillips, his clinic, and the healthcare system where Bramlett had been hospitalized. At the time, Dr. Phillips and his clinic held a $200,000 healthcare professional liability insurance policy with MedPro. Dr. Phillips notified MedPro, and MedPro defended the lawsuit.

The hospital settled with the Bramletts for about $2.3 million, and the litigation continued with Dr. Phillips and his clinic as the remaining defendants. On December 17, 2003, the Bramletts made their first "*Stowers*" demand to settle the remaining claims for $200,000. (Under *G.A. Stowers Furniture Co. v. American Indemnity Co.*, an insurer who rejects a settlement demand within policy limits that a reasonably prudent insurer would accept will later be liable for any amount awarded in excess of the policy limit. 15 S.W.2d 544 (Tex. 1929).) MedPro refused to settle. On March 23, 2004, the Bramletts made a second *Stowers* demand for $200,000, and MedPro again did not settle.

Meanwhile, discovery continued, and evidence was mounting in favor of the Bramletts. In January 2005, counsel for Dr. Phillips advised MedPro that there was a twenty-percent probability of success, and an adverse jury verdict would likely be $3 million. MedPro then extended offers to settle the case with the Bramletts—first for $100,000, then for $200,000.

The Bramletts had rejected both of those offers when they met with MedPro for court-ordered mediation in February 2005. And at that time, the Bramletts demanded $2.3 million to settle the case. MedPro declined but sought advice from outside counsel to assess its own liability to pay for a jury verdict in excess of Dr. Phillips's policy limit.

The case against Dr. Phillips went to trial in August 2005, and the jury returned a surprise $14 million verdict for the Bramletts—$11 million in actual damages and $3 million in punitive damages.[2] Dr. Phillips's counsel wrote to MedPro, demanding that MedPro indemnify Dr. Phillips or else Dr. Phillips could assign his *Stowers* claim to the Bramletts. MedPro agreed to indemnify Dr. Phillips and appealed the verdict.

In 2009, the Supreme Court of Texas reviewed the case and capped Dr. Phillips's liability at $1.6 million—the state's statutory limit for physicians. But the court also held, for the first time, that the Bramletts could sue MedPro directly for the difference between the statutory cap and the jury verdict by stepping "in[to] the shoes" of the insured physician and suing under a *Stowers* theory for MedPro's failure to settle. *Phillips v. Bramlett*, 288 S.W.3d 876, 882 (Tex. 2009).

MedPro upheld its end of the indemnity agreement with Dr. Phillips and paid the Bramletts the amount awarded under the statutory cap. The Bramletts then sued MedPro for the rest of the award. *See Bramlett v. Med. Protective Co.*, 855 F. Supp. 2d 615 (N.D. Tex. 2012). After the court denied MedPro's motion for summary judgment (but before trial), the parties settled for a confidential amount. MedPro then asked its insurer, AISLIC, to cover the settlement. AISLIC refused, setting up the case today.

---

[2] Later, the trial court entered judgment awarding the Bramletts $9,196,364.50 in actual damages and $2,972,000 in punitive damages to account for prejudgment interest and the hospital's settlement. *Phillips v. Bramlett*, 258 S.W.3d 158, 164 & n.3 (Tex. App. 2007).

No. 20-1831                                                        5

*B. The Instant Coverage Dispute*

MedPro first purchased a $5 million insurance policy from AISLIC in June 2005, and it renewed that policy for July 1, 2006, to July 1, 2007. The 2006 Policy is at issue here.

On June 28, 2007—just before the expiration of the policy period—MedPro reported to AISLIC a notice of occurrence/potential claim based on the Bramlett lawsuit. But AISLIC ultimately refused to cover MedPro's settlement with the Bramletts.

In December 2013, MedPro sued AISLIC for breach of contract in federal court on the basis of AISLIC's refusal to cover the settlement as allegedly required by the 2006 Policy.

AISLIC moved for summary judgment, in part, on the basis of the policy's Clause 4(m), known as "Exclusion M." Exclusion M bars coverage for "any claim arising out of any Wrongful Act" that occurred before the policy began if "any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a claim or suit." The district court agreed because it determined that MedPro's rejections of the two *Stowers* demands were Wrongful Acts, for purposes of Exclusion M, that MedPro could have reasonably foreseen would lead to a claim.

MedPro appealed, and as detailed in our prior opinion, we agreed with MedPro's interpretation of "Wrongful Act" in Exclusion M—only *actual* Wrongful Acts precluded coverage. We further held that it should have been left to a jury to decide whether MedPro's rejections of the *Stowers* demands were such actual Wrongful Acts. So we partially reversed the judgment and remanded the case for further proceedings. *Med. Protective Co.*, 911 F.3d at 449.

On remand—but before sending the exclusion issue to a jury—the district court addressed whether MedPro's settlement with the Bramletts was covered under the 2006 Policy at all. In the 2006 Policy, AISLIC agreed "[t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Insured and reported in writing to [AISLIC] during the Policy Period for any Wrongful Act of the Insured." Under the Special Reporting Clause, AISLIC was also liable for claims "subsequently made against the Insured" if MedPro "bec[a]me aware of any occurrence which may reasonably be expected to give rise to a claim against [MedPro] for a Wrongful Act which first occur[red] during or prior to the Policy Period, and provided [MedPro] g[ave] written notice to [AISLIC] during the Policy Period."

The district court first held that MedPro could invoke coverage without itself having to prove that it actually committed a "Wrongful Act." The court then considered whether the policy otherwise did not apply because a "claim" had already been made before the beginning of the policy period. The district court found that none of the earlier communications to MedPro constituted a claim under the policy. Thus, "as a matter of law, a claim was not first asserted against MedPro for its failure to settle for policy limits before the Policy incepted on July 1, 2006."

After finding that MedPro properly invoked coverage, the district court allowed the jury to decide the final issue: "whether [AISLIC] … proved by a preponderance of the evidence that MedPro committed a Wrongful Act when it did not accept the Bramletts' December 2003 or March 2004 $200,000 policy limit demands in settlement of the Bramletts'

malpractice case against Dr. Phillips." The jury was given the definition of "Wrongful Act" from the policy—"any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted"—as well as selections from Texas insurance law, under which "[a]n insurer has a duty to exercise that degree of care and diligence that an ordinarily prudent person would exercise in the management of his own business [and that a]n insurer violates that duty if it does not accept a settlement that is within policy limits if an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to a judgment that exceeds the policy limits."

On January 31, 2020, the jury found that MedPro did not commit a "Wrongful Act," and the district court therefore concluded that, "[b]ecause the jury found that [MedPro] did not commit a wrongful act, Exclusion M of the policy does not apply" and entered final judgment in favor of MedPro. AISLIC moved for a new trial, and the district court denied its motion.

AISLIC now appeals, challenging the district court's decisions that allowed the case to go to a jury at all.

## II. ANALYSIS

"Summary judgment is appropriate when there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law." *Estate of Jones v. Children's Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018)). We review *de novo* the district court's orders deciding these issues as a matter of law. *Id.* In doing so, we apply the substantive law of the state in which the federal court sits in

diversity and will not address a conflict of law unless the parties raise it. *Med. Protective Co.*, 911 F.3d at 445 (citing *Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, 712 F.3d 336, 341 (7th Cir. 2013)). The parties agree that Indiana substantive law applies.

"Indiana law provides that insurance policies are to be governed by the general rules applicable to all contracts." *Koransky*, 712 F.3d at 341–42 (citing *Kimmel v. W. Reserve Life Assurance Co. of Ohio*, 627 F.3d 607, 609 (7th Cir. 2010)). "We begin with the plain language of the contract, reading it in context, and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012). "Where there is ambiguity, insurance policies are construed strictly against the insurer … ." *State Farm Mut. Auto. Ins. Co. v. Jakubowicz*, 56 N.E.3d 617, 619 (Ind. 2016) (citing *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1056 (Ind. 2001)).

AISLIC raises two issues with the district court's interpretation of the 2006 Policy. First, AISLIC argues that our prior interpretation of "Wrongful Act" required the district court to find that MedPro is not covered under the policy because the jury concluded that MedPro did not, in fact, commit a Wrongful Act. Second, AISLIC contends that, contrary to the district court's finding, a "claim" was first made against MedPro before the policy period, which also takes MedPro's settlement with the Bramletts outside of the policy's coverage. We evaluate these arguments in turn.

No. 20-1831                                                    9

A.  *"Wrongful Act"*

At issue here is whether the claim against MedPro for a Wrongful Act—rather than the existence of a factually proven Wrongful Act—was sufficient to invoke coverage under the 2006 Policy. It clearly was.

As stated above, the 2006 Policy generally provided that MedPro could invoke coverage for "claims first made against [MedPro] and reported in writing to [AISLIC] during the Policy Period for any Wrongful Act of the Insured." But the Special Reporting Clause (as amended in Endorsement #16) extended that coverage to "claim[s] … subsequently made against [MedPro] arising out of [a] Wrongful Act" so long as MedPro "g[ave] written notice to [AISLIC] during the Policy Period" of "any occurrence which may reasonably be expected to give rise to a claim against [MedPro] for a Wrongful Act which first occur[ed] during or prior to the Policy Period."

There is no dispute that, pursuant to the Special Reporting Clause, MedPro sent an email on June 28, 2007, that "g[ave] written notice to [AISLIC] during the Policy Period" of a potential claim. In that email, MedPro notified AISLIC of the "Bramlett v. Phillips (Potential Claim)," which is an "occurrence which may reasonably be expected to give rise to a claim against [MedPro] for a Wrongful Act." There is also no dispute that the "possible Wrongful Act"—MedPro's rejection of the Bramletts' *Stowers* demands in 2003 and 2004— "first occur[red] … prior to the Policy Period."

Because MedPro met the above requirements to invoke coverage under the 2006 Policy, "any claim which [wa]s subsequently made against [MedPro] arising out of [the Bramlett settlement] [is] treated as a claim made during the Policy

Period." This alone is enough for us to conclude that MedPro properly invoked coverage for its settlement.

AISLIC, though, homes in on the words "Wrongful Act" in an attempt to upset that conclusion. It contends that the jury's finding that MedPro did *not* commit a Wrongful Act—so that Exclusion M did not apply to preclude coverage—should have resulted in MedPro being unable to invoke coverage in the first place. To achieve this favorable scenario, AISLIC asserts that it just wants us to apply our previous interpretation of the words "Wrongful Act" in Exclusion M, *Med. Protective Co.*, 911 F.3d at 447, to the rest of the 2006 Policy. But even when we apply that interpretation, it does not lead to the outcome that AISLIC thinks it does.

In the previous appeal, we explained that the 2006 Policy defines "Wrongful Act" as "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted." We found that, under its "plain language," Exclusion M[3] only applied when the insured actually committed a Wrongful Act; an unproven allegation that the insured committed a Wrongful Act was not enough to preclude coverage. *Id.* at 447. In support of this conclusion, we noted that, elsewhere in the policy, the Special Reporting Clause[4] uses the phrase "possible Wrongful Act" and

---

[3] Exclusion M precludes coverage for "any claim arising out of any Wrongful Act occurring prior to the inception date of the first Insurance Company's Professional Liability Insurance policy issued by the Company to the Insured …, if on such first inception date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a claim or suit."

[4] The Special Reporting Clause states that "[i]f during the Policy Period … the CFO, General Counsel or CEO of the Insured shall become

that the word "possible" would be rendered meaningless if we inferred it from "Wrongful Act" alone. *Id.* Thus, we agreed with MedPro's narrower interpretation of Exclusion M and sent the case back to the district court to resolve "a genuine dispute of material fact as to whether MedPro committed a Wrongful Act so as to negate coverage." *Id.* at 449.

AISLIC asserts that we must apply the same interpretation of "Wrongful Act" by the "law of the case" doctrine. However, "[t]he doctrine of law of the case comes into play only with respect to issues previously determined." *See Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979). In the prior appeal, we expressly avoided deciding whether there was coverage under the 2006 Policy. *Med. Protective Co.*, 911 F.3d at 446 n.2 ("The district court disposed of this case without addressing the pre-requisite question of whether there was, in fact, coverage under the 2006 Policy, specifically the Special Reporting Clause in Endorsement #16. The parties have not fully developed this issue before us. For the purposes of our analysis, we assume that there was coverage under the 2006 Policy.").

That said, the reasoning from our prior opinion is still persuasive. We agree with AISLIC that the term "Wrongful Act" must refer to an actual, as opposed to merely an alleged, Wrongful Act because, as we have already concluded, the Special Reporting Clause would otherwise contain a

---

aware of any occurrence which may reasonably be expected to give rise to a claim against the Insured for a Wrongful Act … and provided the Insured gives written notice to the Company during the Policy Period … of the nature of the occurrence and specifics of the possible Wrongful Act, any claim which is subsequently made against the Insured arising out of such Wrongful Act shall be treated as a claim made during the Policy Period."

superfluous word—"possible." *See id.* at 447. We disagree with AISLIC, though, about where this definition leads us.

Contrary to AISLIC's assertions, it simply does not follow that this reading of "Wrongful Act" requires the insured to prove that it, in fact, committed a Wrongful Act in order to invoke coverage. Unlike Exclusion M, the coverage provision does not hinge on whether a Wrongful Act has been proven— it merely requires a "claim" for a Wrongful Act that was made or deemed made during the policy period.

To start, consider the relevant clauses: The 2006 Policy covers "sums which the Insured shall become legally obligated to pay as damages resulting from *any claim or claims … for any Wrongful Act* of the Insured." Under the Special Reporting Clause, "*any claim which is subsequently made against the Insured arising out of [a possible] Wrongful Act* [is] treated as a *claim* made during the Policy Period." But Exclusion M precludes coverage for "*any claim arising out of any Wrongful Act* occurring prior to the inception date of the first … policy … if on such first inception date any Insured knew or could have reasonably foreseen that *such Wrongful Act* could *lead to a claim or suit*."

According to Indiana contract law, we must "interpret [the policy] so as to harmonize its provisions, rather than place them in conflict." *U.S. Bank Tr., N.A. for LSF9 Master Participation Tr. v. Spurgeon*, 99 N.E.3d 671, 675 (Ind. Ct. App. 2018). It is easily done. As we read it, the policy is triggered when the insured has become "legally obligated to pay" sums "resulting from" a "claim … for any Wrongful Act." Thus, coverage for a "claim … for any Wrongful Act" does not require a factually proven Wrongful Act. Exclusion M, though, only applies "to any claim arising out of any Wrongful Act …

if … [MedPro] knew or could have reasonably foreseen that such Wrongful Act could lead to a claim or suit." Thus, it "require[s] that AISLIC establish that the claim arose from MedPro's Wrongful Act," *Med. Protective Co.*, 911 F.3d at 447, and not from a mere *claim* for a Wrongful Act.

And this must be true. Otherwise, the policy would require MedPro to prove its own malfeasance before seeking coverage—a bizarre scenario to say the least. There is nothing inconsistent in finding that the 2006 Policy does *not* require MedPro to prove that it actually committed a Wrongful Act to invoke coverage for a claim, while at the same time finding that the insurer must establish that the claim arose from a Wrongful Act to exclude coverage. *See id.* at 447 (quoting *Berry Plastics Corp. v. Ill. Nat'l Ins.*, 903 F.3d 630, 635 (7th Cir. 2018), which noted that, in Indiana, "the insurer has the burden of showing that an otherwise-covered claim is barred by an exclusion in the policy").

Further, AISLIC's preferred reading would put it in the enviable—but legally untenable—position of claiming "heads AISLIC wins, tails MedPro loses." The jury's vindication of MedPro from Exclusion M—by finding that it did *not* act wrongfully—would oust MedPro from policy coverage entirely. But if the jury found that MedPro did commit a Wrongful Act sufficient to invoke coverage, then Exclusion M would step in to once again boot MedPro from coverage. The language of the policy clearly does not require this result for AISLIC. This is clear from our prior remand, which would have been gratuitous if there was no way for MedPro to win. And even if our reading was less clear, we would interpret the policy in favor of the insured to reach it. *Jakubowicz*, 56 N.E.3d at 619 ("Where there is ambiguity, insurance policies

are construed strictly against the insurer." (citing *Allstate Ins. Co. v.*, 759 N.E.2d at 1056)).

AISLIC's tortured reading of the policy would also create conflict between its provisions. For example, where the policy provides coverage for "damages resulting from any claim … for any Wrongful Act of the Insured," one must ignore the words "claim" and "for" to read it as requiring the insured to factually prove that it committed a Wrongful Act. An interpretation that renders specific words without meaning is disfavored, particularly where, as here, a different reading gives meaning to all of the words. *See Spurgeon*, 99 N.E.3d at 675.

In short, even though a proven "Wrongful Act" is the prerequisite for Exclusion M to kick in, the factual existence of a Wrongful Act is *not* a prerequisite for AISLIC to cover a "claim … for any Wrongful Act." AISLIC's suggested reading of the policy results in internal conflict that Indiana law would have us avoid if we can. We can and do avoid that conflict by concluding that MedPro is not precluded from claiming coverage under the 2006 Policy merely because the jury found that MedPro did not, in fact, commit a Wrongful Act.

*B.  "Claims first made"*

We now turn to whether MedPro is nevertheless out of luck because a "claim" was made against it before the policy period began.

As previously explained, MedPro used the Special Reporting Clause to bring into coverage future claims against it related to its handling of the Bramletts' litigation against its insured, Dr. Phillips. MedPro gave timely notice to AISLIC of the "occurrence" that happened *before* the policy period—the Bramletts' action against Dr. Phillips—and thus became

No. 20-1831                                                    15

eligible for coverage of the claim that was brought *during or after* the policy period arising out of that occurrence—the Bramletts' direct action against MedPro in 2009. MedPro loses, however, if a "claim" had already been made against it before the policy period began because the 2006 Policy's "coverage … is limited generally to liability for only those *claims that are first made against [MedPro] … while the policy was in force*"—or at least treated that way under the Special Reporting Clause.

Before trial, the district court held that none of the communications made to MedPro prior to 2009 counted as "claims" against MedPro because, until the Texas Supreme Court case came down in 2009, the Bramletts did not have any cause of action by which they could sue MedPro directly. Much like the first issue, AISLIC's challenge to the district court's conclusion focuses on the definition of one term— "claim."

Claim is not defined in the 2006 Policy, so we apply its ordinary meaning. *Ins. Corp. of Am. v. Dillon, Hardamon & Cohen*, 725 F. Supp. 1461, 1469 (N.D. Ind. 1988) ("Where a policy is a claims made policy, which is specifically written so that coverage attaches when a claim is made, it seems particularly appropriate to give the word claim its ordinary meaning."). And, although the parties disagree about its meaning, we do not think that claim is ambiguous. *Wellpoint, Inc. v. Nat'l Union Fire Ins. Co*, 952 N.E.2d 254, 258 (Ind. Ct. App. 2011) ("An ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." (citing *Linder v. Ticor Title Ins. Co. of Cal.*, 647 N.E.2d 37, 39 (Ind. Ct. App. 1995))); *Dillon*, 725 F. Supp. at 1469 ("Reasonably minded people would have no trouble

figuring out what the word claim means when that word stands alone without some other word or phrase which would suggest an odd or unusual meaning.").

Black's Law Dictionary defines a claim as an "assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or conditional"; or a "demand for money, property, or a legal remedy to which one asserts a right"—particularly "the part of a complaint in a civil action specifying what relief the plaintiff asks for." *Claim*, Black's Law Dictionary (8th ed. 2004). And in Indiana, "for purposes of determining coverage under a 'claims made' policy, a 'claim' is 'a demand for something as a right.'" *Dillon*, 725 F. Supp. at 1468 (quoting *Bensalem Twp. v. Western World Ins. Co.*, 609 F. Supp. 1343, 1348 (E.D. Pa. 1985)).

Although the above sources suggest a range of definitions, we do not read the word claim in a vacuum. *See Barabas*, 975 N.E.2d at 813. For example, Exclusion M precludes coverage if MedPro "knew or could have reasonably foreseen that [its] Wrongful Act could lead to a *claim or suit*." Thus, the 2006 Policy distinguishes a "claim" from a "suit." (We note that the parties do not dispute that the Bramletts' lawsuit against MedPro qualifies as a claim, and we agree that all lawsuits are claims but not all claims are lawsuits.) In addition, the Professional Liability provision explains that AISLIC covers "sums which the Insured shall become *legally obligated to pay as damages* resulting from any claim or claims … for any Wrongful Act of [MedPro]." This reference to a legal obligation taken together with Exclusion M's inclusion of both "claim" and "suit" tells us that a claim can be more than a formal lawsuit but is still rooted in a legal obligation.

No. 20-1831                                                    17

Further, we must be equipped with more than just the definition of claim because the policy is not talking about a claim made by anyone for anything. Instead, when the policy refers to "claims first made … during the Policy Period," it specifies that they are (1) "claims" (2) "made against [MedPro]" (3) "for any Wrongful Act of [MedPro]." The question, then, is not simply whether any claim was made before the policy period; rather it is whether a "claim[ was] first made *against [MedPro]* … for any Wrongful Act *of [MedPro]*" before the policy period.

Now properly equipped for the task, we turn to the communications that AISLIC contends count as claims made against MedPro before the policy period that preclude coverage:

- In December 2004, Dr. Phillips's attorney wrote a letter to MedPro demanding that it engage in settlement negotiations with the Bramletts regarding the medical malpractice action on behalf of Dr. Phillips and asserting that MedPro would be liable for a jury verdict in excess of the policy.

- At a February 2005 mediation, the Bramletts demanded a $2.3 million settlement, alleging *Stowers* issues as to MedPro.

- In March 2005, Dr. Phillips's counsel sent another letter to MedPro, demanding that it settle with the Bramletts and accusing MedPro of acting in bad faith.

- On September 20, 2005, after the jury returned its $14 million verdict but before final judgment, another attorney for Dr. Phillips wrote a letter to MedPro demanding that it indemnify Dr. Phillips and threatening

that, if it did not, then he would assign his *Stowers*
claim to the Bramletts.

- At an October 2005 mediation, the Bramletts de-
  manded $6.9 million from MedPro.

These communications were not claims for a clear reason:
they demanded payment in settlement of the underlying case
based on *Dr. Phillips's* wrongdoing, not MedPro's. They may
point out that MedPro was possibly exposed to greater liabil-
ity upon refusing to settle for the policy limit, but Dr. Phil-
lips's potential, and unrealized, *Stowers* claim is separate from
the underlying action. The underlying claim for which pay-
ment was demanded remained Dr. Phillips's medical mal-
practice, which does not implicate the Professional Liability
provision covering "sums which [*MedPro*] shall become le-
gally obligated to pay as damages resulting from any claim …
for any Wrongful Act of [*MedPro*]." The district court put it
well: "In the end, the Bramletts had no ability to pursue a di-
rect action against MedPro for damages arising out of its fail-
ure to settle within policy limits until 2009, when the Texas
Supreme Court created the right."

In *Medical Protective Co.*, "[w]e express[ed] no opinion on
when the Bramletts' claim against MedPro was made." 911
F.3d at 448 n.6. After reviewing the proffered communica-
tions in light of the 2006 Policy, we now conclude that no
"claim" was "first made *against [MedPro]* … for any Wrongful
Act *of [MedPro]*" until after the policy period began. Thus,
MedPro timely invoked coverage.

## III. Conclusion

The district court did not err in concluding that MedPro
was covered by the 2006 Policy before the jury decided the

No. 20-1831                                              19

issue of exclusion. We therefore AFFIRM the district court's
decisions, and the final judgment stands.